**IIN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JUSTIN TACKETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 22-cv-1260** |
| | ) | |
| **DAVID MITCHELL, PERCY MYERS, CHRISTINE BROWN, MARCIA HILL, BILL LOY, JOSHUA LANE, and PHIL MARTIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

In his Third Amended Complaint, Justin Tackett claims that medical providers and prison officials acted with deliberate indifference to his chest and lung symptoms at Pinckneyville and Robinson Correctional Centers. (Doc. 46).

Before the Court are two motions for summary judgment. Defendants Percy Myers, Marcia Hill, and Joshua Lane filed the first Motion, with a supporting memorandum, on October 8, 2025. (Docs. 108, 109). Defendants David Mitchell, Christine Brown, Bill Loy, and Phil Martin filed a Combined Motion for Summary Judgment the same day. (Doc. 111). Plaintiff Justin Tackett responded to both Motions (Doc. 113), and Defendants replied (Docs. 115, 117). For the reasons explained below, both Motions are **GRANTED**.

## BACKGROUND

### I. OPERATIVE CLAIMS

Tackett filed this action under 42 U.S.C. § 1983 while incarcerated in the Illinois Department of Corrections ("IDOC"). His claims concern care for chest and lung complaints at Pinckneyville Correctional Center and follow-up care after his transfer to Robinson Correctional Center. (Doc. 46).

The Court screened Tackett's Second Amended Complaint, and allowed him to proceed on two claims: (1) an Eighth Amendment deliberate indifference claim against Dr. Percy Myers and Nurse Marcia Hill, for their treatment of Tackett's ongoing lung issues from approximately October 2021 through his transfer to Robinson in October 2022 (Claim 1); and (2) an Eighth Amendment deliberate indifference claim against Warden David Mitchell and Health Care Unit Administrator Christine Brown for their handling of Tackett's lung related grievances (Claim 2). (Doc. 17, pgs. 3–6). The Court later granted Tackett leave to add Claim 4, an Eighth Amendment claim against Bill Loy, Phil Martin, and Joshua Lane for allegedly failing to ensure adequate follow-up care for the same chest or lung condition at Robinson. (Doc. 42, pgs. 3–6). Loy also remains a defendant in his official capacity for a claim of prospective medical relief. (Doc. 42, pgs. 5–6).

The Third Amended Complaint is the operative pleading. (Doc. 46). The Court considers later diagnoses and symptoms, and the treatment of those conditions, insofar as they bear on the chest and lung claims raised in the Third Amended Complaint. The Court does not, however, treat references in Plaintiff Tackett's deposition to new factual bases as independent claims to be added to this case. See *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488–90 (7th Cir. 2023) (explaining the distinction between a new legal theory and a new factual claim and the Court's discretion over constructive amendment). Tackett

did not move to amend after acknowledging the scope issue during his deposition, and a new factual claim after merits discovery and summary-judgment briefing would be untimely and prejudicial.

## II. Rule 56 and the Evidentiary Record

Defendants served Tackett with notices explaining Federal Rule of Civil Procedure 56 and Southern District of Illinois Local Rule 56.1. (Docs. 110, 112). Tackett filed a five page handwritten response. (Doc. 113, pgs. 1–5). The response is not sworn, despite being captioned in part as an affidavit and statement of facts. It discusses general legal standards but fails to respond to Defendants' proposed facts paragraph by paragraph. It also fails to cite to the record or provide counterevidence. Local Rule 56.1 requires a party opposing summary judgment to respond to each proposed material fact and to support a dispute with a specific citation to admissible evidence. SDIL-LR 56.1(f). A properly supported material fact is deemed admitted unless specifically disputed. SDIL-LR 56.1(g). The Court therefore treats Defendants' supported, uncontroverted material facts as admitted for purposes of the Motions.

The Court has also considered other materials in the record. Fed. R. Civ. P. 56(c)(3). Tackett signed his operative pleading under penalty of perjury. The Court therefore has considered specific facts in that pleading to the extent they are within Tackett's personal knowledge and otherwise admissible. See *James v. Hale*, 959 F.3d 307, 314–16 (7th Cir. 2020); *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013). The Court likewise considers Tackett's sworn deposition testimony and the medical evidence, his grievances, referral information, and the declaration he submitted with the Motions. However, the Court

distinguishes testimony about symptoms Tackett experienced and statements he personally heard from unsupported medical conclusions or guesses about what Defendants did outside his presence. See Fed. R. Civ. P. 56(c)(4). As it must in this posture, the Court resolves all ambiguities in the recounting of facts in favor of the nonmovant, Plaintiff Tacket.

## III. Material Facts

### A. Myers and Hill

Defendant Percy Myers, a physician, served as Pinckneyville's medical director. He examined Tackett, ordered diagnostic tests, and prescribed medication. (Doc. 109-2, ¶¶ 2–3, 17, 38). Defendant Marcia Hill was a licensed practical nurse who saw Tackett during nursing sick-call visits. She assessed his complaints, could provide acetaminophen under a nursing protocol, and could refer him to a physician or other medical provider for further evaluation. (Doc. 109-3, ¶¶ 2–3, 7, 9–10, 13).

Tackett arrived at Pinckneyville on August 27, 2021. Two days later, he reported shortness of breath and chest discomfort. Staff recorded oxygen saturation readings between 94% and 98%. A COVID test was administered and came back negative. The medical records state that Tackett later denied discomfort and shortness of breath and returned to his housing unit without distress. (Doc. 109-5, pp. 9–13; Doc. 109-2, ¶¶ 5–6).

Tackett continued to report lung pain, cough that produced discolored material, and other symptoms over the following year. At his deposition, Tackett testified that his lung pain began before he arrived at Pinckneyville. He described "stabbing pains, ripping, tearing feelings" in his lungs. Asked whether the pain came and went, he

answered, "It was steady. It was constant." (Doc. 109-1, p. 41:19–p. 42:7). On a visit dated October 19, 2021, Defendant Myers recorded that Tackett had clear lungs, no discolored material, normal laboratory results, and a normal examination. Still, he ordered additional testing. (Doc. 109-5, pg. 43; Doc. 109-2, ¶ 17). On November 17, 2021, Tackett reported a constant productive cough and other symptoms. Myers again recorded clear lungs, no cough during visit (which lasted ten to fifteen minutes), clear material, and normal bloodwork and physical findings. He ordered a B12 level. (Doc. 109-5, pgs. 51–52; Doc. 109-2, ¶ 23).

On January 7, 2022, Tackett again reported that he was coughing up yellow material. Myers recorded that Tackett could not produce sputum in the examination room, his lungs were clear, he was afebrile, and his oxygen saturation was 98%. Myers explained that the findings did not support requiring a chest x-ray. He prescribed Mucinex and advised Tackett to increase his fluids. (Doc. 109-5, pp. 85–86; Doc. 109-2, ¶ 38).

The parties dispute Hill's January 19, 2022 encounter with Tackett. According to Hill, Tackett presented a "jar full of spit," which she held to the light without seeing any color. She referred him to mental health staff because she believed his complaints were related to his mental health condition. (Doc. 109-5, p. 88; Doc. 109-3, ¶ 8). Tackett testified that the sample contained visible color, questioned whether Hill had held and inspected it, and recalled her telling him that he was crazy and that nothing was wrong with him. He also testified that Hill had refused on multiple occasions to provide a specimen cup or send a sample for testing. (Doc. 109-1, p. 51:8–22). His verified complaint further states

that, on January 19, 2022, he reported flu-like symptoms and requested a specimen cup and pain medication. Hill allegedly refused and told the accompanying officer that Tackett was "sick in the head." (Doc. 46, p. 14 ¶ 51, p. 18 ¶ 69). For purposes of summary judgment, the Court credits Tackett's account of his reported symptoms and Hill's responses.

At visits on February 10 and February 22, 2022, Myers again recorded clear lungs, no fever, and oxygen saturation of 98%. At the February 10, 2022 visit, he ordered more blood work. (Doc. 109-5, pp. 102–03, 109–10; Doc. 109-2, ¶¶ 46, 50).

The later record contains potentially conflicting objective observations. On March 1, 2022, a nurse observed approximately quarter sized, tan, thick phlegm and routed or referred the issue. But that nurse also recorded oxygen saturation of 99%, clear lungs, no shortness of breath, and no distress. (Doc. 109-5, pgs. 113–14). On March 3, 2022, Tackett reported stabbing lung pain and a productive cough. Myers' notes from that day recorded clear lungs, oxygen saturation of 98%, no fever or night sweats, and sternal tenderness. A physician assistant, Desai, independently confirmed normal or excellent lung sounds, easy respirations, and no cough. Myers discontinued Mucinex, which Tackett had reported was not helping, and prescribed naproxen for tenderness around the breastbone. (Doc. 109-5, pp. 102, 116–17; Doc. 109-2, ¶ 54). On March 12, 2022, a nurse observed some light tan phlegm but no blood. But Tackett again had clear lungs, oxygen saturation of 99%, and no distress. (Doc. 109-5, pgs. 123–24). Later March 2022 encounters continued to document Tackett's complaints, clear lungs, oxygen saturation between 98% and 99%, and provider referrals. (Doc. 109-5, pgs. 126–30).

On April 12, 2022, Tacket reported a fall, and at the ensuing visit Hill observed bruising and left chest or rib pain. She referred him to a provider. (Doc. 109-5, pg. 133; Doc. 109-3, ¶ 9). Myers evaluated Tackett on April 14, 2022. At that visit, he observed bruising and tenderness, increased Tackett's naproxen prescription, added a Tylenol prescription, and ordered PA and lateral chest imaging because of concern about a potential rib fracture. (Doc. 109-5, pg. 135; Doc. 109-2, ¶ 61). The radiology report lists "Shortness of breath" as the reason for the examination. It identified no fluid around the lungs, no masses, nor a collapsed lung and concluded that there was "[n]o acute intrathoracic disease process." (Doc. 109-6, p. 18). Myers later documented that the x-ray was normal and relied on that result at a May 2022 visit. (Doc. 109-5, pp. 139, 155; Doc. 109-2, ¶¶ 65, 70).

Tackett continued reporting chest or lung symptoms through the summer of 2022, and described dismissive encounters with Myers in April and May of 2022. (Doc. 109-1, p. 59:18–p. 60:20; Doc. 109-5, pp. 139, 155). Nurses and Hill repeatedly recorded clear lungs, oxygen saturation around 98%, and no acute distress. At times they supplied symptom medication. At some times they made provider referrals. (Doc. 109-5, pgs. 145, 150, 153, 157, 160, 169, 171–72). Myers last saw Tackett on September 28, 2022, and Tackett transferred to Robinson on or about October 7, 2022. (Doc. 109-2, ¶¶ 81–82).

On October 11, 2022, a repeat chest x-ray produced a different radiological interpretation of Tacket's condition. The radiologist reading that x-ray recorded findings consistent with inflammation in the lower portion of Tackett's right lung, a condition called pneumonitis. The report stated that the same findings were visible on the April

2022 x-ray and appeared longstanding and unchanged. (Doc. 109-6, p. 19). Myers states that the comparison confused him because it identified a lung condition that the April 2022 report had not mentioned. He is not a radiologist and says he relied on an outside radiologist's April 2022 interpretation. (Doc. 109-2, ¶ 83). The record does not show that Myers independently interpreted the April 2022 images or received a report identifying a lung abnormality before Tackett's transfer.

### B. Brown

Defendant Brown was Pinckneyville's Health Care Unit Administrator. Her responsibilities included directing, coordinating, and reviewing Health Care Unit operations with the Medical Director and Nursing Director. She was a registered nurse but did not regularly provide direct treatment in her administrative role and could not diagnose, create a treatment plan, prescribe medication, or independently order the tests and outside referrals at issue. When asked to assist with a medical grievance, she reviewed the prisoner's chart to determine whether licensed providers were seeing and treating the prisoner, and she could follow up with the Medical Director or another provider. (Doc. 114-1, ¶¶ 1–7).

Brown had actual notice of Tackett's recurring complaints. After Tackett's mother reported that Tackett was experiencing shortness of breath and that he had not received a chest x-ray or had his sputum tested, Brown wrote on January 4, 2022 that Tackett had "been referred several times and not seen" and directed that he be seen "ASAP." (Doc. 109-6, p. 59). Brown also reported that day that she had placed Tackett on the physician call list for evaluation. (Doc. 109-6, p. 71). Myers answered the next day that he would

reevaluate Tackett and explained that the prior examinations showed clear lungs, no fever, normal respiration, and insufficient diagnostic sputum. He stated that he did not consider an x-ray clinically indicated on those findings. Brown later documented the January 7, 2022 evaluation, oxygen saturation of 98%, clear lungs, Mucinex prescription, and Hill's January 19, 2022 report of clear material. (Doc. 109-6, pgs. 57–59, 71). Tackett also testified that he complained directly to Brown about Myers's treatment and asked her to obtain an x-ray. He could not reliably recall her response and had no personal knowledge of what she did afterward. (Doc. 109-1, p. 136:17–24; p. 137:9–19).

Brown also reviewed and responded to repeated grievance inquiries. Her responses summarized provider and nursing visits, laboratory results, medications, normal vital signs, clear lung findings, and the providers' stated reasons for not ordering the culture or imaging Tackett wanted at that time. (Doc. 111-4, pp. 1–2, 9–10, 17–18, 62–63; Doc. 114-1, ¶¶ 8–9). A later grievance reported continuing lung pain and stated that naproxen and Tylenol were not helping. The July 7, 2022 grievance report reproduced Brown's explanation that Myers had investigated Tackett's lung complaints without finding an abnormality, stating that "[y]ou can't treat something, if there is nothing abnormal." Brown also stated that she could not order medications or tests. (Doc. 111-4, pp. 62–63).

### C. MITCHELL

Defendant Mitchell was Pinckneyville's Warden and was not a licensed medical provider. (Doc. 118-1, ¶¶ 1–2). The warden's office designated numerous lung-related grievances for emergency review. (See, e.g., Doc. 111-4 pp. 3, 5, 7, 11, 13, 19, 27, 34). The

warden's office also concurred in denying grievances. Those denials incorporated the Health Care Unit's summaries of Tackett's treatment. (Doc. 111-4, pp. 1–2, 9–10, 17–18). Tackett also testified that he spoke with Mitchell once for approximately two minutes. During that conversation he described his severe lung pain, his coughing up material, and other symptoms. He said that medical staff were not determining what was wrong. According to Tackett, Mitchell took a note, said he would speak with someone, and may have told a correctional officer to call healthcare. Tackett does not know what Mitchell or the officer did afterward. (Doc. 109-1, p. 124:11–22; p. 125:8–25; p. 126:2–16).

Robinson staff continued evaluating Tackett after the October 2022 x-ray. On November 10, 2022, Dr. Glen Babich reviewed the x-ray findings of inflammation in the lower portion of Tackett's right lung. He ordered blood tests and prescribed doxycycline, an antibiotic, twice daily for three months. (Doc. 109-5, p. 189). The final laboratory report on a sample of Tackett's coughed-up mucus identified "normal respiratory flora." (Doc. 109-7, p. 11).

A December 13, 2022 chest x-ray showed no acute heart or lung abnormality. (Doc. 109-7, p. 6). A sinus x-ray taken that day suggested thickening of the tissue lining the sinus behind Tackett's right cheek. The radiologist noted that image quality limited the assessment and suggested repeating the x-ray or obtaining a CT scan if medical concerns persisted. (Doc. 109-7, p. 5).

**D. Lane**

Defendant Joshua Lane was Robinson's Medical Records Director. His responsibilities included scheduling outside medical appointments after a medical

provider ordered them. He was not a medical provider. He could not independently order treatment or specialist visits, and he did not schedule ordinary onsite appointments. (Doc. 109-4, ¶¶ 2, 4). Babich ordered a chest CT on January 18, 2023, and Wexford's Utilization Management department authorized the referral on January 20, 2023. (Doc. 109-6, pp. 88, 127). Wexford's Utilization Management department authorized a sinus CT on February 17, 2023. (Doc. 109-6, p. 136). On April 17, 2023, a nurse recorded that Tackett asked when the chest CT would occur and left a note for Medical Records and Lane. (Doc. 109-6, p. 101). Both scans took place on April 25, 2023. The chest CT showed lungs that appeared normal and no acute abnormality. The sinus CT showed a small amount of fluid in the sinus behind Tackett's left cheek, but the remaining findings were normal. (Doc. 109-6, pp. 151–53).

On May 5, 2023, Wexford's Utilization Management department authorized an ear, nose, and throat (ENT) consultation that Dr. Vickie Becker had requested as nonurgent for Tackett's persistent sinus complaints. (Doc. 109-6, p. 154; Doc. 109-7, p. 32). Records from July of 2023 through September of 2023 contain scheduling updates and requests to check the referral's status. On September 27, 2023 Lane recorded that the outside ENT evaluation had been scheduled. (Doc. 109-6, pp. 107, 111–13). The visit occurred on November 22, 2023 approximately six and one-half months after authorization. The consultant diagnosed Tacket with allergy related inflammation and recommended Flonase. They stated that no ENT follow up was needed and suggested a neurology consultation. A service certificate identifies Lane as Robinson's facility contact. (Doc. 109-7, pgs. 32–33).

Lane states that nonurgent referrals were processed "in the order they were received." (Doc. 109-4, ¶ 23). He stated that outside provider availability, some providers' unwillingness to treat incarcerated patients, and IDOC transportation could all affect the timing of treatment. (Doc. 109-4, ¶ 23). The record does not include Lane's communications with the ENT office. It contains no evidence that the office could have offered an earlier appointment. Nor does it show that Lane caused a cancellation.

### E. Martin

Martin was Robinson's Health Care Unit Administrator. He did not provide direct medical care. He could not diagnose conditions or prescribe treatment. Martin reviewed Tackett's medical records when responding to grievance inquiries. He could follow up with staff responsible for Tackett's care. (Doc. 114-3, ¶¶ 1–7, 9).

In responding to Tackett's October 26, 2022, grievance, Martin reported that a physician had not yet reviewed the October 11, 2022, chest x-ray. He said Tackett had an appointment for that review. Martin also cited an October 16, 2022, nurse examination that found clear lungs and normal breathing. He noted an oxygen saturation of 97%. (Doc. 111-4, pp. 21, 23). In a later response, Martin reported that he had met with Tackett to discuss his concerns. He told Tackett that staff were awaiting laboratory results from a mucus sample. (Doc. 111-4, p. 36).

Tackett's January 26, 2023 grievance reported missing prescriptions and a continued wait for a CT scan. (Doc. 111-4, pp. 68–69). The February 8, 2023 grievance report reproduced Martin's response. Martin relayed Lane's update that scheduling of the chest CT was underway. He also reported contacting Nurse Rice about the missing

medication. According to the response, Rice contacted Boswell Pharmacy, and the medication was on its way to the facility. (Doc. 111-4, p. 66).

### F. Loy

Loy served as Robinson's Assistant Warden of Programs beginning in May 2022. He served as Acting Warden from April 18, 2023, through September 5, 2023. He was not a medical provider. Loy stated that he generally forwarded medical concerns raised in person to the Health Care Unit Administrator and Director of Nursing for investigation and follow-up. (Doc. 114-2, ¶¶ 1–2, 4).

Tackett testified that he spoke with Loy about five times. He estimated that each conversation lasted no more than two minutes. (Doc. 109-1, p. 127:2–7; p. 128:10–13). On one occasion, Tackett told Loy that nothing was being done about his medical concerns. According to Tackett, Loy directed him to Martin. (Doc. 109-1, p. 130:4–15). During another conversation, Loy told him, "I'll look into it. It's not going to be today, but I'll find out what's going on." Tackett said Loy seemed sincere. (Doc. 109-1, p. 131:4–15). Asked what Loy did after their conversations, Tackett answered, "I don't think he took any actions, but that's my opinion." (Doc. 109-1, p. 132:2–5).

Tackett was released from IDOC custody in April 2024. (Doc. 111-1, pg. 20:5–10).

## Legal Standards

The Court will grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An assertion that a fact cannot be or is genuinely disputed must be supported by citations to particular materials in the record or by a showing that the cited materials do not establish the fact or the adverse party cannot produce admissible evidence to support it. Fed. R. Civ. P. 56(c)(1).

If the movant presents evidence showing the absence of a genuine dispute of material fact, the burden shifts to the nonmovant to identify evidence of specific facts creating a genuine dispute for trial. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A dispute is genuine if the evidence would permit a reasonable jury to return a verdict for the nonmovant. *Driveline Systems*, 936 F.3d at 579. An inference resting only on speculation or conjecture is insufficient. *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 721 (7th Cir. 2018).

When considering the Motions, the Court does not weigh the evidence, determine credibility, or choose among competing reasonable inferences. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The Court instead views the evidence and draws reasonable inferences in the nonmovant’s (here, Tackett's) favor, asking only whether a genuine factual dispute requires trial. *Id.* at 893–94.

Prison medical and correctional personnel violate the Eighth Amendment when they act with deliberate indifference to an incarcerated person's serious medical need. *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021); *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017). A plaintiff must establish both an objectively serious medical condition and the defendant's deliberate indifference to the plaintiff's health or safety. *Jones*, 2 F.4th at 612; *Orlowski v. Milwaukee County*, 872 F.3d 417, 422–23 (7th Cir. 2017). The Court

considers the inmate's medical care as a whole. *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019).

A condition may be objectively serious if a physician diagnosed it as requiring treatment, a layperson would recognize the need for medical attention, or the failure to treat it could result in further significant injury or unnecessary and wanton infliction of pain. *Lockett v. Bonson*, 937 F.3d 1016, 1022–23 (7th Cir. 2019); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). The condition need not be life threatening, and a condition can be obvious even if a layperson could not identify its cause. *Jones*, 2 F.4th at 612; *Orlowski*, 872 F.3d at 423. The Court assumes, without deciding, that Tackett's persistent chest and lung symptoms and the diagnosed pneumonitis satisfy this objective component.

The subjective component requires evidence that the defendant knew facts from which a substantial risk of serious harm could be inferred, actually drew that inference, and intentionally or recklessly disregarded the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Jones*, 2 F.4th at 612–13. A factfinder may infer actual knowledge from circumstantial evidence, including the obviousness of the risk. *Farmer*, 511 U.S. at 842. Negligence, medical malpractice, an inadvertent failure to provide adequate care, and a mere disagreement with medical judgment are not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105–07 (1976); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Courts defer to a medical professional's treatment decision unless no minimally competent professional would have responded in the same way under the circumstances. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). A reasonable response is not unconstitutional merely because it fails to avert

harm. *Orlowski*, 872 F.3d at 424. Medical treatment may support a deliberate indifference claim only if it is such a substantial departure from accepted professional judgment, practice, or standards that it demonstrates the absence of professional judgment. *Campbell*, 936 F.3d at 545; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The fact that an inmate received some treatment is not conclusive if the treatment was blatantly inappropriate. *Roe*, 631 F.3d at 858. Nonmedical officials ordinarily may rely on the judgment of treating medical personnel. That reliance does not protect an official who has reason to believe that medical personnel are mistreating or failing to treat the prisoner. *Hayes v. Snyder*, 546 F.3d 516, 527–28 (7th Cir. 2008).

The Eighth Amendment does not entitle an inmate to demand a particular medication, diagnostic test, referral, or preferred course of treatment. See *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Pyles*, 771 F.3d at 411. A factfinder may infer deliberate indifference when a professional persists in a course known to be ineffective, ignores specialist instructions, chooses an easier and less efficacious treatment without exercising judgment, or inexplicably delays necessary treatment. *Petties v. Carter*, 836 F.3d 722, 729–31 (7th Cir. 2016) (en banc). But later information does not retroactively establish what an earlier provider knew. See *Collignon v. Milwaukee County*, 163 F.3d 982, 989–90 (7th Cir. 1998).

When delay is the theory, its significance depends on the seriousness of the condition, the defendant's knowledge, the ease of treatment, the reason for the delay, and the resulting harm. See *Arnett*, 658 F.3d at 753; *McGowan v. Hulick*, 612 F.3d 636, 640–41 (7th Cir. 2010). The plaintiff must offer competent evidence that could permit a jury to

find that the delay itself, rather than the underlying condition, caused harm or exposed him to a serious additional risk of harm. Unnecessarily prolonged pain qualifies as harm even if the underlying condition did not worsen. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021); *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Williams v. Liefer*, 491 F.3d 710, 714–16 (7th Cir. 2007); see also *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833–35 (7th Cir. 2026). This evidence need not invariably be expert testimony, but it must connect the delay itself to the claimed harm.

Finally, liability under § 1983 is personal. A defendant must have caused the constitutional deprivation or demonstrably acquiesced in it; title, supervisory status, and general job duties do not suffice. *Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th Cir. 2022). Receipt of a grievance can establish notice, but it does not by itself establish deliberate indifference or causation. See *Vance v. Peters*, 97 F.3d 987, 993–94 (7th Cir. 1996); *Burks v. Raemisch*, 555 F.3d 592, 595–96 (7th Cir. 2009).

## Analysis

The Court assumes that Tackett's persistent symptoms and diagnosed pneumonitis constituted a serious medical need. That assumption resolves the objective component in his favor for these motions. It does not establish what each Defendant knew at an earlier encounter or whether that Defendant consciously disregarded the risk. The Court considers those questions individually and credits Tackett's firsthand accounts, including the statements most unfavorable to Defendants.

### I. Claim 1 – Myers and Hill

#### A. Myers

The evidence does not permit a reasonable finding that Myers consciously disregarded Tackett's condition. Tackett may disagree with Myers's diagnosis and treatment, and the record may support criticism of some of those decisions. But the constitutional question is whether Myers abandoned professional judgment or knowingly persisted in inadequate care. *Pyles*, 771 F.3d at 409, 411; *Petties*, 836 F.3d at 729–31. The record does not permit an inference that he did either.

Tackett's account supplies evidence of persistent symptoms and dismissive responses. He testified that Myers would listen to his lungs and "tell me everything sounded fine and he wasn't going to do anything." (Doc. 109-1, p. 42:19–22). He disputed the description of his sputum as yellow: "It was more of a greenish, brownish, blackish." (Doc. 109-1, p. 49:17–20). Describing the April 26, 2022 encounter, he was "pretty sure" that Myers said "the X ray was fine. You can leave now." (Doc. 109-1, p. 59:18–23). In May 2022, Tackett reported a crawling or tingling sensation in his lung and back area. Myers allegedly responded, "there's nothing crawling on you. You can leave now." (Doc. 109-1, p. 60:13–20). Tackett also testified that Myers told him to discard mucus he had coughed into a napkin without meaningfully inspecting it. On another visit, Myers refused to examine a sample because it could have belonged to someone else. (Doc. 109-1, p. 43:1–12). Tackett's verified complaint further states that Myers told him, "I'm done talking to you," and would not allow him to continue explaining his concerns. (Doc. 46, p. 17 ¶ 65). The Court accepts those accounts with the qualifications Tackett gave them.

The Court considers both Myers's statements and his alleged refusals to inspect the samples. Providing some care does not itself answer whether he consciously

disregarded a serious need. The relevant question is what those refusals show when considered alongside his assessment and treatment of Tackett's complaints. Myers did not maintain one unchanged treatment in the face of every complaint. He examined Tackett, tried various medications directed at Tackett's symptoms, and reassessed him with Desai. When asked whether Myers and Desai listened to his lungs on March 3, 2022, Tackett answered, "Yes, they did." He also acknowledged the actions they took in response to that examination, including the naproxen prescription. (Doc. 109-1, p. 56:21–p. 57:19). On March 3, 2022, Myers discontinued Mucinex, which Tackett had reported was not helping. He prescribed naproxen for the tenderness he found around Tackett's breastbone. (Doc. 109-5, pp. 102, 116–17).

The April 2022 imaging also gave Myers a specific basis for his subsequent assessments. Its contemporaneous interpretation reported no acute intrathoracic disease. (Doc. 109-6, p. 18). The October 2022 reader reached a different conclusion and identified similar findings retrospectively. (Doc. 109-6, p. 19). That later interpretation, together with Tackett's reported partial improvement while taking the prescribed antibiotic, may support an argument that an earlier diagnosis or different treatment would have helped. (Doc. 109-5, pp. 189, 191, 193). But an ex post interpretation can not establish that Myers recognized and disregarded a substantial risk when he treated Tackett. Myers states that he relied on the April 2022 radiologist's interpretation. (Doc. 109-2, ¶ 83). The Court considers that explanation together with Tackett's accounts of his persistent symptoms and Myers's refusals.

In *Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005), the evidence permitted an inference of knowing persistence in ineffective care despite repeated visits and medication changes. *Petties* likewise involved evidence that providers withheld indicated care. 836 F.3d at 731–33. Those decisions turn on what the evidence shows about the provider's judgment and knowledge at the time the treatment was provided. Here, Tackett's accounts establish that Myers knew his complaints were continuous. The Court considers those accounts with Myers's examinations, the contemporaneous radiology report, and his response to the reported failure of the Mucinex prescription. Together, that evidence does not permit a reasonable finding that Myers recognized his response as inadequate to a substantial risk and nevertheless persisted in it. See *Lockett*, 937 F.3d at 1023–25. Instead, it demonstrates that Myers was aware of a medical need, and attempted a variety of approaches to discover the underlying cause of that need while also trying a variety of approaches to manage the ongoing symptoms as they were reported, despite diagnostic and lab work showing normal function and good lung oxygen levels.

Because the evidence does not permit a reasonable inference that Myers consciously disregarded Tackett's medical need, Myers is entitled to summary judgment.

**B. HILL**

Tackett's January 19, 2022 account establishes that Hill refused assistance after he reported "flu-like symptoms" and "asked for pain medication." (Doc. 46, p. 14 ¶ 51). He testified that "[t]here was definitely color" in the material he presented and recalled Hill "telling me that I was crazy and that there's nothing wrong with me." (Doc. 109-1, p. 51:8–22). His verified complaint further states that Hill called him "sick in the head." (Doc. 46,

p. 18 ¶ 69). The Court credits that account, including the alleged refusal to inspect the material and provide medication.

Hill could dispense acetaminophen under a nursing protocol and seek a provider referral. (Doc. 109-3, ¶¶ 7, 13). Her alleged refusal therefore represents a decision to withhold available assistance. The information Tackett describes giving her, however, establishes awareness of reported illness and a request for symptom relief. His detailed testimony about constant, stabbing lung pain concerned his encounters with Myers, not Hill. (Doc. 109-1, p. 41:19–p. 42:7). Attributing that same understanding of his pain to Hill would require speculation about what he communicated to her or what she observed.

The alleged remarks and refusal support an inference that Hill assessed Tackett's complaints carelessly and treated him dismissively. A finding that she actually appreciated a substantial risk from leaving those complaints untreated would require additional inferences about their severity as presented to her. The January 19, 2022 evidence leaves those inferences to pure speculation. Cf. *Gayton v. McCoy*, 593 F.3d 610, 623–24 (7th Cir. 2010) (reversing summary judgment where an inmate's documented chest pain, high blood pressure, and active vomiting presented a risk so obvious that subjective knowledge did not require speculation). Hill is entitled to judgment on the January 19, 2022 encounter because Tackett's evidence fails to establish the required subjective knowledge or a risk so obvious that knowledge could be reasonably inferred.

Hill's other encounters likewise support judgment in her favor. On December 21, 2021, she documented that Tackett complained of coughing up green material but could not produce it during the examination. She also recorded that he voiced no complaint of

pain. (Doc. 109-5, p. 73; Doc. 109-3, ¶ 7). That presentation gave Hill notice of a cough without identifying a substantial risk from her decision to forgo a referral. On April 12, 2022, Hill observed bruising after Tackett reported a fall and referred him to a provider. She thus obtained further evaluation for the injury she identified. (Doc. 109-5, p. 133; Doc. 109-3, ¶ 9).

On August 24, 2022 Hill received a more specific report of pain. She recorded that Tackett had experienced lung pain for more than a year and rated it "9/10." She examined him, recorded clear lungs and oxygen saturation of 98 percent, and noted his reported possession of acetaminophen. She selected "No MD referral." (Doc. 109-5, p. 171). Hill explains that her normal examination led her to conclude that a provider referral was unnecessary. (Doc. 109-3, ¶ 10).

The pain rating establishes Hill's awareness of significant reported pain. Her response must therefore be assessed under the professional-judgment standard. Her examination addressed the pulmonary complaint, and her medication inquiry identified an available means of pain relief. The record documents those steps, but leaves the effectiveness of the acetaminophen unresolved.

The referral form strengthens Tackett's criticism of Hill's decision. It identifies "signs of acute, severe discomfort" as a reason to obtain physician review. (Doc. 109-5, p. 171). The "9/10" report supports an argument that Hill should have made that referral. Under *Petties*, departure from a treatment protocol also supplies circumstantial evidence relevant to conscious disregard. *Petties*, 836 F.3d at 729. Here, that evidence must be evaluated with Hill's examination and her understanding that Tackett had pain

medication available. The record establishes Hill's knowledge of pain and access to medication, but supplies no comparable evidence that she knew the medication was ineffective. *Cf. Berry v. Peterman*, 604 F.3d 435, 442–43 (7th Cir. 2010) (reversing summary judgment where medical staff persisted in an ineffective course of pain relievers despite the inmate's repeated complaints that the medication was not working). The pain rating warrants scrutiny of her assessment. But inferring that she knowingly relied on ineffective treatment would require speculation about Tackett's use of the medication and Hill's understanding of its effect.

Taken together, the August 24, 2022 evidence could, at most, support a finding that Hill should have obtained further evaluation. Even considered with her alleged dismissive responses, it falls short of showing a departure from professional judgment sufficient to support a reasonable inference of conscious disregard. See *Gayton*, 593 F.3d at 623. Hill is entitled to summary judgment on Claim 1.

## II. CLAIM 2 – BROWN AND MITCHELL

Brown and Mitchell responded as administrators. They could rely on treating professionals unless they knew that reliance would leave a substantial risk unaddressed. *Hayes*, 546 F.3d at 527–28; *Arnett*, 658 F.3d at 755–56. Their positions did not make them responsible for every medical decision, but each remained responsible for his or her own conduct. *Burks*, 555 F.3d at 595–96.

### A. BROWN

Brown recognized a problem with prior referrals and acted on it. On January 4, 2022, she wrote: "This guy has been referred several times and not seen for spitting up

green phlegm . Please have him seen ASAP." Myers replied the next day: "I will be more than happy to re-evaluate him in the clinic." (Doc. 109-6, p. 58). Brown placed Tackett on the physician line, and Myers examined him on January 7, 2022. (Doc. 109-6, p. 71; Doc. 109-5, pp. 85–86). This sequence documents an intervention that produced an examination.

Tackett continued to complain, and Brown received additional notice. Later grievance responses show that provider examinations, laboratory work, imaging, and further clinical review were all addressed. (Doc. 111-4, pp. 1–2, 9–10, 17–18, 62–63; Doc. 114-1, ¶¶ 8–9). Tackett also told Brown of his concerns about Myers and testified, "I asked her to try to get an X-ray done." (Doc. 109-1, p. 136:19–24). Asked whether he remembered her response, he answered, "I do not, but I'm -- if I took my best guess, I'm pretty sure she said that she would look into it." (Doc. 109-1, p. 137:9–16).

Brown's nursing training bears on what she could understand. Her administrative responsibilities are relevant to analysis of her response to Tackett's concerns. (Doc. 114-1, ¶¶ 1–7). Neither her training nor Tackett's reported continuing symptoms can establish that she understood the clinicians to be abandoning him or were knowingly allowing an ordered intervention to remain unavailable. She secured an examination after recognizing failed referrals and later reviewed clinical responses to the renewed complaints. That response showed active regard to any risk she could have been aware of to Tackett's health. Tackett identifies no evidence that can be used to connect that conduct to a conscious disregard of a substantial risk. Brown is therefore entitled to summary judgment.

**B. MITCHELL**

The Court assumes that Tackett gave Mitchell meaningful notice of a serious medical concern. Tackett testified that he described "severe pains in my lungs," sputum, and other symptoms. (Doc. 109-1, p. 125:14–25). He recalled Mitchell's response: "He took a note down, said he would talk to somebody and I never seen them again." (Doc. 109-1, p. 125:10–11). Tackett also recalled a possible instruction to a guard to contact healthcare, but did not know whether that contact occurred. (Doc. 109-1, p. 126:5–13). Asked whether he knew what Mitchell did after walking away, Tackett answered, "I do not." (Doc. 109-1, p. 126:14–16).

Mitchell's promise to inquire does not prove that he performed an inquiry. Tackett's lack of personal knowledge likewise does not prove that Mitchell failed to act. The Court considers his account and the grievance narratives together with the documented medical responses and actions taken. (Doc. 111-4, pp. 1–2, 9–10, 17–18). Considered together, those materials do not permit a reasonable finding that Mitchell knowingly left an ongoing medical failure unaddressed, obstructed care, or learned that his particular response had failed and consciously refused further assistance. Any such finding would be reliant on speculation outside the scope of the evidence provided. Circumstantial evidence could establish disregard. Here, however, the notice supplied by the conversation and grievances does not support the additional inference that Mitchell consciously accepted a substantial risk to Tackett. Thus, Mitchell is entitled to summary judgment on that ground.

**III. CLAIM 4 – MARTIN, LOY, AND LANE**

### A. Martin

Martin had actual notice and administrative follow up capacity. The record shows that he reviewed Tackett's chart and grievances, met with him, communicated that the October 2022 x-ray awaited physician review, confirmed that a physician visit was scheduled, followed the sputum-testing status, tracked the chest CT, and contacted nursing about missing prescriptions. Those facts establish Martin's personal involvement, and they also demonstrate that he actively responded to the information he received.

The December 2022 grievance, which Martin reviewed, reported worsening symptoms and unsuccessful refill requests. Martin confirmed the prescription and directed Tackett to nursing for the refill. (Doc. 111-4, pp. 42, 44–45). The Court assumes that Martin received the entire grievance. The prior unsuccessful requests call his response's adequacy into question, but the evidence falls short of showing that he knowingly directed Tackett into a process he understood would leave the medication unavailable.

Tackett also testified that Martin said the sputum sample would never have been sent had he been present. (Doc. 109-1, p. 118:6–24). The Court credits that statement. It supports a dismissive attitude toward Tackett's complaints, but the sample had already been sent and Tackett identifies no subsequent interference with the test. Considered together, the remark and refill response leave a finding of conscious disregard, once again, to speculation. Martin is entitled to summary judgment on the subjective component.

### B. LOY

The Court likewise credits Tackett's testimony that he spoke with Loy several times and repeatedly described his medical concerns. According to Tackett, Loy appeared concerned, promised to speak with others, and on one occasion directed him to Martin. Tackett believes Loy did nothing, but he admits that conclusion is his opinion and that he lacks personal knowledge of Loy's later actions. (Doc. 111-1, pgs. 127–32).

Loy was not a medical provider and so he did not control diagnosis, medication, diagnostic orders, or outside scheduling. Loy directed Tackett to Martin on one occasion. His declaration describes forwarding concerns as his general practice. (Doc. 114-2, ¶ 4; Doc. 109-1, p. 130:4–15). The Robinson record documents active care by medical personnel and follow-up by Martin. Other grievance actions were taken by different Robinson officials, so the Court cannot attribute every institutional decision to Loy merely because he served as Assistant or Acting Warden.

Loy received specific notice of the outstanding CTs when he reviewed the April 2023 grievance. He declined emergency handling on April 21, 2023. (Doc. 111-4, pp. 72–73). The scans occurred April 25, 2023, and his later concurrence followed a response reporting their completion. (Doc. 109-6, pp. 151–53; Doc. 111-4, p. 70). Tackett supplies no evidence connecting Loy’s routing decision to additional harmful delay or a serious additional risk. Considered with their conversations, the grievance evidence fails to support a reasonable finding of Loy’s conscious disregard. Loy is therefore entitled to summary judgment on the claim that he was deliberately indifferent in his individual capacity.

### C. Lane

Lane's role was narrower and operational. He scheduled provider-ordered offsite specialty visits. He did not decide whether a CT or ENT consultation was medically indicated and could not order one independently. The Court considers the full 95-day chest CT delay, 67-day sinus-CT delay, and 201-day ENT delay. Lane participated in chest CT scheduling by February of 2023. (Doc. 111-4, p. 66). For this analysis, the Court assumes that Tackett could establish culpable delay attributable to Lane.

Tackett's testimony establishes suffering during those waits. The authorizations establish the need for further investigation. But the clinical records and testimony supply no reasonable basis to attribute additional harm or a serious additional risk to the postponements themselves. The later findings, once again, cannot supply that missing connection. Lane is entitled to summary judgment on causation. See *Barnes*, 177 F.4th at 833–34.

## IV. Prospective Relief and Qualified Immunity

The only surviving official capacity theory sought prospective relief from Loy concerning care at Robinson. Tackett was released from IDOC custody in April 2024. He is no longer subject to Robinson's medical care or scheduling practices, and there is no evidence of a realistic possibility that he will again be subjected to those institution specific conditions. The request for prospective relief is therefore moot. See *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996).

## Disposition

For the foregoing reasons, the Motion for Summary Judgment filed by Defendants Percy Myers, Marcia Hill, and Joshua Lane (Doc. 108) is **GRANTED**. The Combined Motion for Summary Judgment filed by Defendants David Mitchell, Christine Brown, Bill Loy, and Phil Martin (Doc. 111) is **GRANTED** as to all Defendants in their individual capacities. The Court **DISMISSES WITHOUT PREJUDICE**, as moot, the remaining official-capacity claim for prospective relief against Loy.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Percy Myers, Marcia Hill, Joshua Lane, David Mitchell, Christine Brown, Bill Loy, and Phil Martin and against Plaintiff Justin Tackett. The Clerk shall then **CLOSE** this case.

**SO ORDERED.**

Dated: September 23, 2026

Judge Dugan

Digitally signed by Judge Dugan
Date: 2026.09.23 15:34:13 -05'00'

DAVID W. DUGAN
United States District Judge